Daniel SPETHMANN, Mark A. Kelley, and Jeffrey Crawford, Appellants,

v.

Fred R. ANDERSON, Strategic Controls Corporation, and Strategic Gas Services, Inc., Appellees.

No. 05–04–01139–CV.

Court of Appeals of Texas, Dallas.

Aug. 18, 2005.

Daniel B. Jones, Plano, James A. McCorquodale, Vial Hamilton Koch & Knox, Dallas, for Appellants.

Ronald G. Wiesenthal, St. Louis, MO, for Appellees.

Before Justices MORRIS, LANG, and MAZZANT.

## OPINION

Opinion by Justice MAZZANT.

Daniel Spethmann, Mark A. Kelley, and Jeffrey Crawford appeal the trial court's judgment rendered against them in favor of Fred R. Anderson, Strategic Controls Corporation, and Strategic Gas Services, Inc. Appellants bring seventeen issues challenging the legal and factual sufficiency of the evidence to support the jury's verdict. After reviewing all the evidence, we affirm in part, reverse and render in part, and reverse and remand in part.

## I. BACKGROUND

Fred Anderson headed his family's corporation, Gas Services, Inc. (GSI). As the company grew, it hired Mark Kelley, CPA, to be the in-house accountant for GSI. Over time, Anderson came to rely heavily on Kelley's financial expertise. In 1996, Kelley was the chief financial officer for GSI and was a 10 percent shareholder in the corporation. Under a stock-purchase agreement with GSI, Kelley could demand the company buy his shares for book value.

Fred Spethmann owned two corporations, Strategic Controls Corporation (SCC) and BMP Software. Spethmann and Anderson met through GSI's use of BMP's software. After working on a project together, Anderson and Spethmann decided in 1996 that their companies complemented one another and that it might be advantageous to merge. They intended for Spethmann and Anderson to be equal shareholders in the merged corporation and Kelley and Jeff Crawford, an employee of SCC, to be lesser shareholders.

In the spring of 1997, Kelley, on behalf of GSI, and Spethmann began examining each other's companies in their "due diligence" analysis. One obstacle to a merger as equals became apparent: GSI had a book value of approximately $1.6 million, but SCC had a book value of only $400,000. This situation resulted in a hotly disputed area of evidence. Anderson testified Spethmann told him that his software development company, BMP, would be included in the merger, that BMP was worth nearly a million dollars, and that BMP and SCC combined would come close to equaling the book value of GSI. Anderson also testified Spethmann made these statements in front of Kelley and Crawford and they said nothing. Spethmann denied telling Anderson that BMP was worth nearly one million dollars or that BMP and SCC together would almost equal the value of GSI. Kelley testified he told Anderson that under the accounting principles GSI used, BMP had no book value, and he testified he told Anderson the merger was a "bad deal." Anderson testified Kelley never told him these things.

As Kelley and Spethmann continued the due diligence investigations, Anderson was trying to build business in Venezuela and Bolivia. In July 1997, Anderson sent an employee, Steve House, to Bolivia. House had to change planes in Mexico City, where he was arrested and jailed for having a firearm in his luggage. Anderson's time and energy then became consumed

by trying to get House safely out of Mexico. Anderson's efforts succeeded, and House was released by the Mexican authorities on October 12, 1997.

Meanwhile, Kelley had examined his own prospects under the merger and realized they would be damaged by the merger. In GSI, he was a 10 percent shareholder in a $1.6 million corporation; after the merger, as then envisioned by the parties, he would be a five percent shareholder in a $2 million corporation, which would result in an immediate loss of $40,000 equity. On August 13, 1997, Kelley sent Anderson a letter requesting GSI buy back his stock pursuant to the GSI stock-purchase agreement. Both Kelley and Anderson interpreted the letter as a notice of resignation. Anderson testified the letter was "a huge blow" because Anderson relied heavily on Kelley's financial expertise, and Anderson had no time to personally handle the merger while he was trying to get House out of Mexico. After getting the letter, Anderson asked Kelley to explain why he wanted to sell his shares. Kelley prepared a chart styled "Mark's Stock Inequality." This chart showed the reasons Kelley thought he should have a 15 percent share of the new company instead of a five percent share. Anderson agreed to give Kelley a 30 percent share in GSI, which would result in his having a 15 percent share of the merged companies. Thus, going into the merger, Anderson owned 70 percent of GSI and Kelley owned 30 percent.

The closing on the merger was scheduled for November 12, 1997, and the parties met in a pre-closing meeting on November 5, 1997, to work out any last minute problems. At that meeting, Anderson observed that the GSI–SCC merger was unequal because BMP was not included in the merger papers. Anderson testified that Spethmann agreed to include BMP, which Spethmann said was "just under $1 million." Spethmann made this representation concerning the value of BMP in front of Kelley, and Kelley did not contradict Spethmann. Spethmann explained that BMP was not included in the merger in order for it to realize certain tax advantages. However, he promised Anderson it would be included in the new parent company by April 1, 1998. Based on Spethmann's promise to include BMP in the merger and his representation of its value, Anderson agreed to go ahead with the merger. The merger closed on November 12, 1997.

Part of the merger agreement included a stock-purchase agreement called the Buy–Sell Agreement. Under that agreement, the company could demand a shareholder surrender his shares for the book value of the company. The repurchase of the shares could be paid for with cash or with an unsecured no-interest promissory note paid in five equal installments over four years.

The new company was called Strategic Gas Services, Inc. (SGSI), and the shareholders were Anderson (35%, 1800 shares), Spethmann (35%, 1800 shares), Kelley (15%, 771.4 shares), and Crawford (15%, 771.4 shares). In SGSI, Anderson was chairman of the board of directors and business development manager. Spethmann was president and a director, Kelley was chief financial officer, and Crawford was vice president of operations.

As business development manager, Anderson continued his work in Venezuela and Bolivia. Anderson's expenses, including his salary, were about $17,000 each month. The other shareholders disagreed with Anderson's view of the value of his efforts in South America, and they told Anderson they wanted the traveling expenses to stop by April 1 because the

company did not have the money to pay for his efforts.

In April, the company's note with the bank came up for renewal. This note was owed by GSI and was for a million dollar line of credit. Anderson had guaranteed the note. When the note came up for renewal in April 1998, the other shareholders asked Anderson to guarantee the renewed note. Anderson did so. The other shareholders did not sign the guaranty.

In May 1998, appellants decided to remove Anderson from the company. At a meeting on May 22, 1998, Spethmann said the company would buy back Anderson's shares for "what [he] came in with." On May 28, 1998, Anderson sent appellants a memo stating the amount he came in with was $1.8 million, and he also demanded the company relieve him of his personal guaranty to the bank. Negotiations then ensued over the details of buying Anderson's shares. Spethmann structured deals under both the Buy–Sell Agreement and under the promise to give Anderson what he came in with. All the offers were rejected by Anderson, and he remains a shareholder. Anderson's role as an employee, officer, and director in the company ceased in June 1998.

In October 1998, SGSI sold GSI for $2.4 million, of which $1.7 million was in cash and the remainder paid the balance on the line of credit owed to the bank, thus relieving Anderson of his potential liability to the bank on his guaranty of the line of credit. The money from the sale was put in the bank, where it earned three percent interest. In late October, Spethmann proposed to Kelley that Spethmann borrow $300,000 of the money at seven percent interest. Spethmann intended to put the money into a corporation he owned that developed distributorships of vitamins and other nutritional products. Kelley determined that the loan would not hurt the company's ongoing operations.

Kelley prepared a promissory note in which SCC loaned Spethmann $300,000 at seven percent interest rate, requiring monthly payment of interest, with $100 late fees if the interest payments were more than ten days late, but no payment of principal until the due date of the note, April 30, 2000. The note was unsecured and lacked an acceleration clause. It appears from the testimony that the bylaws or other rules of SCC required the loan be approved by the other directors, Crawford and Kelley. The day before Spethmann signed the note, Spethmann told Crawford about the loan. Crawford told Spethmann that $300,000 was a lot of money and that they would have to discuss it later. Spethmann then told Kelley he "had run it by" Crawford. On November 1, 1998, Spethmann signed the promissory note, and Kelley authorized the wire transfer to Spethmann. That same day, Kelley saw Crawford, and Crawford told Kelley he did not approve of the loan to Spethmann. Kelley tried to stop the wire transfer of the money, but it was already too late. Kelley and Crawford confronted Spethmann and demanded he return the money; Spethmann refused. Kelley consulted an attorney to learn what could be done. The trial court excluded testimony of what the lawyer told Kelley, but Kelley and Crawford took no legal action. Between November 1998 and April 1999, Spethmann did not make the monthly interest payments, and he did not pay the late fees. The minutes of the April 9, 1999 meeting of the board of directors stated the loan was unauthorized by SCC because Spethmann wired the funds to a bank account he controlled without the knowledge or authorization of the other SCC director, Crawford. Spethmann refused to approve the minutes. On April 15, 1999, Kelley and Crawford sent Spethmann a letter de-

manding Spethmann return the $300,000 principal and pay the unpaid interest and late fees.

The minutes of the April 22, 1999 SCC board of directors meeting showed the meeting was attended by Crawford and Kelley. The minutes stated Spethmann had made no interest or principal payments on the unauthorized loan, that Spethmann had taken advances from the corporation for $30,208, and that Crawford and Kelley had worked diligently to get Spethmann to pay this loan and the advances. The minutes then stated SCC was authorized to make eighteen-month nonrecourse loans to Crawford and Kelley in the amount of $222,842 at seven percent interest secured by their stock in SGSI. The minutes stated SCC would authorize the $300,000 loan to Spethmann if its terms were changed to a nonrecourse loan like those approved for Crawford and Kelley. The minutes then acknowledged the diligent work of the officers, Spethmann, Crawford, and Kelley, and resolved to give them each a bonus of $33,000, less any advances outstanding on the date of payment. Spethmann refused to turn the $300,000 note into a non-recourse note, and he still failed to pay the interest and accruing late fees. Kelley then began deducting the interest payments from Spethmann's pay check each month.

Although the minutes authorized Crawford and Kelley to receive $222,842 loans, those loans were not funded. The $33,000 bonuses, however, were paid. Kelley testified the purpose of the bonuses was to *properly account* for Spethmann's unpaid advances, to equalize the compensation to Kelley and Crawford due to Spethmann's advances, and also to reward them for their diligent work.

Spethmann's borrowing of the $300,000 soured Kelley and Crawford's relationship with him. At the same time, the company's business declined, and it became apparent that the company could not afford to pay all three of them. Crawford and Kelley lacked the funds to buy out Spethmann, so in July 1999, they announced their intention to resign.

Under the Buy–Sell Agreement, when a shareholder ceases his employment with SGSI, his shares become available for sale. The first party with an option to purchase the shares is the other "Related Shareholder," that is, the other shareholder from the same original corporation in the merger. Thus, Spethmann had the first option to purchase Crawford's shares, and vice-versa, and Anderson had the first option to purchase Kelley's shares. If the Related Shareholder declined to purchase the shares, then SGSI had the option to purchase. If SGSI declined to purchase the shares, then the shareholders from the other merging corporation had the option to purchase the shares. The price for the shares was to be "book value per Share using generally accepted accounting principles, as determined by the Company's certified public accountant." The purchaser of the shares, whether another shareholder or SGSI, had the option of paying in cash or giving a no-interest promissory note payable in five annual installments with the first installment due within thirty days of the date of the note.

In accordance with the Buy–Sell Agreement, notice was sent to the other shareholders, including Anderson, that the shares were for sale for $288.88 per share. Anderson asked for more information about the stock sale, but he did not exercise his option to purchase the shares. Spethmann, as a director of SGSI, approved SGSI's purchase of Crawford's and Kelley's shares. Crawford and Kelley, as directors, approved the purchase of each other's shares, but they did not participate in the approval of their own shares. The

purchases were in cash, not installments, for $222,842.03 to each of them, which was three cents more than the unfunded nonrecourse loans they had approved for themselves in April.

The purchase of Kelley's and Crawford's stock depleted about 80 percent of SGSI's cash resources. However, Kelley and Crawford testified they thought the company was still viable and that they would not have taken the cash if they had thought it would cripple the company. After Kelley and Crawford left, Spethmann tried to sell SGSI, but the deal fell through. SGSI then ceased doing business.

At trial, Spethmann testified he did not pay the $300,000 note when it became due and that he has made no interest payments other than those deducted from his paycheck by Kelley.

Anderson sued appellants for common-law fraud, fraud in a stock transaction under section 27.01 of the Texas Business and Commerce Code, and negligent misrepresentation arising out of Spethmann's misrepresentation that the value of SCC and BMP would almost equal the value of GSI. Anderson sued Kelley for breach of fiduciary duty for remaining silent when Spethmann made the misrepresentation. Anderson also sued appellants for conspiracy. SGSI sued appellants for breach of fiduciary duty from Crawford's and Kelley's sale of their stock to SGSI. SCC sued appellants for breach of fiduciary duty for the $300,000 loan to Spethmann. Anderson also requested exemplary damages based upon appellants' malice and attorney's fees.

The jury found appellants liable to Anderson for common-law and statutory fraud and negligent misrepresentation concerning the merger, that Anderson suffered damages of $1,680,000, and that Anderson should receive exemplary dam-

ages of $250,000 from Crawford, $300,000 from Kelley, and $1,000,000 from Spethmann. The jury found that Kelley breached his fiduciary duty to Anderson in the merger and that Anderson suffered damages of $318,261. The jury also found appellants conspired against Anderson.

The jury found appellants breached their fiduciary duty to SGSI concerning the sale of Crawford and Kelley's stock, that SGSI's damages were $445,684.06, and that SGSI should receive exemplary damages of $250,000 from Crawford, $300,000 from Kelley, and $2,000,000 from Spethmann. The jury found appellants breached their fiduciary duty to SCC concerning the "loan" to Spethmann and that SCC's damages were $300,000. The trial court entered judgment in accordance with these findings.

## II. FRAUD, NEGLIGENT MISREPRESENTATION, CONSPIRACY, AND BREACH OF FIDUCIARY DUTY TO ANDERSON

### A. Liability

In the first, second, third, fifth, and thirteenth issues, appellants assert the evidence is legally and factually insufficient to support the jury's findings that they were liable to Anderson for statutory and common-law fraud and negligent misrepresentation and that Kelley was liable to Anderson for breach of fiduciary duty. Anderson's claims were based on his testimony that before the merger, Spethmann represented to him that BMP was worth just under a million dollars, the representation was made in front of Kelley, Kelley knew BMP was worth nothing or much less than a million dollars, Kelley did not contradict Spethmann, and Anderson relied on Spethmann's representation of the value of BMP and Kelley's silence in deciding to go ahead with the merger. Speth-

mann testified he made no such representation to Anderson, and Kelley testified he told Anderson that BMP had no value.

 In determining the legal sufficiency of the evidence, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex.1998); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 808–09 (Tex.2005). We will uphold the finding if more than a scintilla of evidence supports it. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995); *see City of Keller*, 168 S.W.3d at 813–14. More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Burroughs Wellcome Co.*, 907 S.W.2d at 499 (quoting *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994)); *see also City of Keller*, 168 S.W.3d at 822 ("If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so."). In determining the factual sufficiency of the evidence, we consider and weigh all the evidence. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex.1996). Findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.*

## 1. Kelley's Liability for Statutory Fraud, Affirmative Common–Law Fraud, and Negligent Misrepresentation

 In the second issue, Kelley contends the evidence is legally and factually insufficient to support Anderson's causes of action against him for statutory fraud,[1] common-law fraud through affirmative misrepresentation,[2] and negligent misrepresentation [3] because Anderson did not allege or present any evidence of Kelley making an affirmative misrepresentation to him concerning the merger. We agree there is no evidence of Kelley making an affirmative misrepresentation or supplying false information to Anderson, and we conclude there is no evidence to support the jury's findings on these causes of action

---

**1.** To prove statutory fraud in a stock transaction under section 27.01 of the Texas Business and Commerce Code, a plaintiff must show: (1) a false representation of a past or existing material fact, when the false representation is (A) made to a person for the purpose of inducing the person to enter into a contract; and (B) relied on by that person in entering into that contract; or (2) a false promise to do an act, when the false promise is (A) material; (B) made with the intention of not fulfilling it; (C) made to a person for the purpose of inducing that person to enter into a contract; and (D) relied on by that person in entering into that contract. Tex. Bus. & Com.Code Ann. § 27.01(a) (Vernon 2002).

**2.** The elements of common-law fraud through affirmative misrepresentation are: (1) a material misrepresentation; (2) that was false when made; (3) that was known by the speaker to be false when it was made or that was made recklessly as a positive assertion without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party justifiably relied on the representation; and (6) the party was injured as a result. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001).

**3.** Negligent misrepresentation requires proof that (1) the defendant, in the course of his business or in a transaction in which he had an interest; (2) supplied false information for the guidance of others; (3) without exercising reasonable care or competence in communicating the information; (4) the plaintiff justifiably relied on the information; (5) proximately causing the plaintiff's injury. *See McCamish, Martin, Brown, & Loeffler v. FE Appling Interests*, 991 S.W.2d 787, 791 (Tex. 1999).

against Kelley. We sustain the second issue to the extent it concerns the causes of action against Kelley for statutory fraud, common-law fraud through affirmative misrepresentation, and negligent misrepresentation.

## 2. Kelley's Liability to Anderson for Breach of Fiduciary Duty and Common–Law Fraud Through Non–Disclosure and Spethmann's Liability to Anderson

In the first, second, and thirteenth issues, Kelley argues the evidence is legally and factually insufficient to support the jury's finding him liable for common-law fraud through nondisclosure[4] and breach of fiduciary duty[5] because, Kelley asserts, the evidence shows he tried to persuade Anderson not to proceed with the merger,

making Anderson's reliance on Kelley's silence unjustifiable. In the first and fifth issues, Spethmann also asserts the evidence is legally and factually insufficient to support the jury's finding him liable for statutory and common-law fraud and negligent misrepresentation because Anderson could not have justifiably relied on any representation by him concerning BMP's value.

■ To support their argument that Anderson could not have justifiably relied on Spethmann's representation of the value of BMP, appellants cite to Kelley's testimony that he repeatedly told Anderson that BMP would not equalize the value Anderson and Spethmann brought into the merger. However, Anderson testified Kelley did not tell him that.[6]

---

**4.** The jury was instructed that "Fraud occurs when—(1) a party fails to disclose a material fact within the knowledge of that party, (2) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, (3) the party intends to induce the other party to take some action by failing to disclose the fact, and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact." *See Formosa Plastics Corp., USA v. Presidio Eng'rs & Contractors, Inc.,* 941 S.W.2d 138, 144 (Tex.App.-Corpus Christi 1995), *rev'd on other grounds,* 960 S.W.2d 41 (Tex.1998).

**5.** The jury was instructed that Kelley had the burden to prove he complied with his fiduciary duty to Anderson. The instructions stated that to prove he complied, Kelley had to show: (a) the transaction in questions was fair and equitable to Anderson; (b) he made reasonable use of the confidence Anderson placed in him; (c) he acted in the utmost good faith and exercised the most scrupulous honesty toward Anderson; (d) he placed Anderson's interests before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Anderson, and did not place himself in any position where his self-interest might conflict with his obligations as a fiduciary; and (3) he fully and fairly disclosed all important infor-

mation to Anderson concerning the transaction.

**6.** Anderson's testimony concerning Kelley's failure to tell him BMP was not worth just under a million dollars was in response to a question from appellants' attorney:

 Q. Didn't Mr. Kelley tell you prior to the merger that BMP, in fact, did not have a value of $900,000?

 A. I don't recall him ever saying that, no, sir.

Appellants argue, "Anderson's testimony that he 'cannot recall' Kelley informing him that BMP was not worth $900,000 is not evidence that Kelley did not do so." We disagree. Anderson's testimony was not that he could not recall whether Kelley had told him; his answer consisted of two parts: (1) he did not recall Kelley ever telling him that; and (2) "no, sir." In context, it is clear that Anderson's answer was intended to be a denial of appellants' counsel's assertion that Kelley had told him that BMP was not worth $900,000.

Appellants also cite to Anderson's testimony where he admitted testifying as follows in a deposition:

 Question: Okay, do you deny that Mr. Kelley told you that BMP was not worth $900,000?

■ Appellants also cite to Kelley's stock inequality chart that Anderson admitted receiving, which shows that the value of Kelley's stock, and thus also Anderson's, would decline substantially as a result of the merger. However, Anderson testified that when Kelley prepared the chart, Kelley was not aware of the plan to include BMP in the merger. Because, according to Anderson, the chart shows the value of the merger without BMP, it does not prove Anderson could not have justifiably relied on Spethmann's representation about the value of BMP.

Appellants also argue that Anderson could not have justifiably relied on Spethmann's representation that BMP had a book value of just under one million dollars because Defendant's Exhibit 6, the balance sheet for BMP as of July 31, 1996, showed BMP had a book value of $330,642.42. However, no evidence in the record showed Anderson ever saw this document. Also, no evidence showed the value of BMP on July 31, 1996 was the same as it was during the merger.

Appellants also argue that Anderson could not have justifiably relied on Spethmann's representation that the combined book values of SCC and BMP would be nearly the same as GSI because, appellants assert, the representation was made in the adversarial context of business negotiations. Appellants, however, cite to no evidence that Spethmann and Anderson were adversaries in the merger. By the last time Spethmann made the misrepresentation, which Anderson testified was one week before the closing of the merger, the two companies had worked as partners on projects for over a year, and the combining of their corporate offices and functions had been ongoing for about eight months.

We conclude the evidence is legally and factually sufficient to support the jury's finding that Anderson justifiably relied on Spethmann's representation about the value of BMP and Kelley's silence in the face of Spethmann's representation. We overrule appellants' first, second, fifth, and thirteenth issues as to Anderson's causes of action against Spethmann for common-law and statutory fraud and negligent misrepresentation and as to Anderson's causes of action against Kelley for breach of fiduciary and common-law fraud through nondisclosure.

### 3. Crawford's Liability to Anderson

■ In the third issue, Crawford asserts the evidence is legally and factually insufficient to support the fraud findings against him. We agree the evidence is legally insufficient. The record contains no evidence of any affirmative representation by Crawford concerning the book value of BMP or the combined book value of

---

Answer: I do not recall.

Question: He may have told you that, you just didn't remember as you sit here today?

Answer: He was aware of the negotiation and the relative values anticipated and expected the CFO would take exception if there was something misleading or misstated.

When Anderson was asked to affirm that he did not remember whether Kelley told him BMP was not worth $900,000, Anderson did not do so. Anderson's two answers, read together, show (1) he did not recall Kelley telling him BMP was not worth $900,000, and (2) he expected Kelley to tell him if BMP or the other companies to be merged did not meet their expected value. Contrary to appellants' assertion, this deposition testimony does not prove Anderson could not recall *whether* Kelley told him BMP was not worth $900,000. Assuming this deposition testimony tended to impeach Anderson, it did not require the jury to reject his in-court testimony. Jurors are the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819.

BMP and SCC. The record also contains no evidence that Crawford was aware that Spethmann's representations to Anderson were false. Accordingly, we conclude there is no evidence to support one or more elements of Anderson's common-law and statutory fraud, his negligent misrepresentation, and conspiracy causes of action.

## B. Damages for Fraud and Negligent Misrepresentation

■ In their fourth and sixth issues, appellants complain that the damages awarded Anderson for his fraud and negligent misrepresentation claims are excessive. The jury found Anderson's damages for both fraud causes of action and the negligent misrepresentation cause of action were $1,680,000. The standard of review for a claim of excessive damages is factual sufficiency of the evidence. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex.1998). In reviewing the factual sufficiency of the evidence, our task is to determine whether the jury's findings of $1,680,000 damages are so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. We sustain the third issue.

### 1. Formula for Fraud Damages

■ In determining the damages for the fraud causes of action, the trial court instructed the jury:

Consider the following elements of damages, if any, and none other.

The difference in the value of Fred Anderson's stock in Strategic Gas Services, Inc. on the day it was issued and

the amount it would have been worth but for the fraud made the subject of Question No. 1 [statutory fraud] and 3 [common-law fraud].

The jury answered $1,680,000.[7] We construe the term "value of Fred Anderson's stock in [SGSI] ... but for the fraud" as meaning the value Anderson's stock in SGSI would have had if SCC and BMP had been worth Spethmann's representation of their value. Thus, the instruction required the jury to apply the following equation: Damages equal the Represented Value of Anderson's 35 percent of SGSI on the day of the merger minus the Actual Value of his 35 percent of SGSI on the day of the merger, or: $D = .35\,RV - .35\,AV$. The Represented Value was Spethmann's representation to Anderson that the combined values of SCC and BMP would nearly equal the value of GSI. Thus, the Represented Value of SGSI was approximately 2 GSI. The Actual Value was the combined actual values of GSI, SCC, and BMP. Thus, the formula for the damages may be expressed as $D = (.35 \times 2\,GSI) - .35\,(GSI + SCC + BMP)$, with all values computed on the day of the merger.

### 2. Formula for Negligent Misrepresentation Damages

The jury was instructed to determine Anderson's negligent misrepresentation damages in the past using the following formula:

The difference between the value Fred Anderson has received in the transaction and the purchase price or value given.

The jury answered $1,680,000.[8] We construe this instruction as requiring the jury

7. The question then asked the jury to determine "The amount of earnings lost by Fred Anderson from the date of his discharge by Strategic Gas Services to the date of trial. Do no include in your answer any amount that you find Fred Anderson could have earned by

exercising reasonable diligence in seeking other employment." The jury answered this damages element "$0.00." Anderson does not appeal that jury finding.

8. Using that same formula, the jury was also asked to determine Anderson's damages that

to apply the equation of Damages equal the Value Given, which was Anderson's 70 percent of GSI, minus the Value Received, which was 35 percent of SGSI. This formula may be expressed as $D = VG - VR$, or $D = .7\ GSI - .35\ SGSI$. Because SGSI was the combined value of the companies, the formula becomes $D = .7\ GSI - .35\ (GSI + SCC + BMP)$.

### 3. The Formulas Unified

Because .7 GSI and .35 × 2 GSI are the same, the two damages formulas, even though worded differently, actually are the same: the value of 70 percent of GSI (which is the same as 35 percent of the represented value of SGSI) minus the actual value of 35 percent of SGSI, with all values determined as of the time of the merger. It is logical for the two formulas to be identical because, as the merger was to be an exchange of equal values, the value Anderson gave in the form of his shares of GSI should have equaled the value he received in SGSI but for the fraud.

### 4. Calculations Under the Formula

Much of the evidence showed GSI was worth, and that before the merger the parties thought it was worth, about $1.6 million. The evidence also showed SCC was worth about $400,000 and BMP was worth nothing, which would make the value of SGSI $2 million. Using these values in the damages formula, 70 percent of GSI ($1.12 million) minus 35 percent of SGSI ($700,000) yields damages of $420,000, or only one-fourth of the $1.68 million in the jury's answers.

Even if the jurors considered SCC and BMP to be worth nothing, their calculations under the trial court's instructions still could not approach $1.68 million. Using those zero values in the damages formula, Anderson's damages would be 70 percent of GSI ($1.12 million) minus 35 percent of SGSI (and if the only company with any value was GSI, it would be $560,000), which would equal $560,000. This is only one-third of the damages found by the jury.

By contrast, Anderson asserts the value that should be assigned to GSI should be the amount it sold for after the merger, $2.4 million, and that SCC should be valued not at zero, but at −$92,783, as Anderson reported its value to the IRS in his income tax return for 1997.[9] Anderson contends the damages calculation should simply be 70 percent of $2.4 million, which is $1.68 million. However, because the

"in reasonable probability will be sustained in the future," and the jury answered "$0.00." The jury was then asked to determine "The pecuniary loss, if any, otherwise suffered as a consequence of Fred Anderson's reliance on the misrepresentation." For the damages that "were sustained in the past," the jury answered "0.00"; for the damages that "in reasonable probability will be sustained in the future," the jury answered $261,000. The trial court did not award the $261,000 future damages. Anderson does not appeal these jury findings or the trial court's failure to render judgment on the $261,000 future damages.

9. Anderson argues the value of the stock in SGSI was zero based on SCC's negative val-

ue. However, the only way the jury could find Anderson's damages were $1.68 million was by finding the value of SCC and BMP equaled −$2.4 million. No evidence supports this assertion.

Appellants assert the $2.4 million sale price is inappropriate because the sale was almost a year after the merger, and Kelley testified that GSI was improved, made "more profitable," and achieved a "very positive cash flow" between the merger and the sale. Kelley testified that if they had tried to sell it at the time of the merger, "we would not have had the same results." Because we conclude that using the $2.4 million valuation does not support the damages award, we need not consider this argument.

jury had to use the formula prescribed by the trial court, we cannot agree with his calculation. Adding the sale price of GSI, $2.4 million, the negative tax-return value for SCC, −$92,783, and zero for BMP gives a value for SGSI $2,307,217. Anderson's 35 percent share of that would equal $807,525.95. When one subtracts $807,525.95 from Anderson's 70 percent of GSI, $1.68 million, according to the formula, the balance is damages of $872,474.05. These damages are only about 52 percent of the $1.68 million in damages found by the jury.

Anderson also asserts the damages could be calculated by starting with the combined value of GSI and SCC at $2 million, subtracting 35 percent of the value of SCC, and awarding Anderson 70 percent of the remaining figure. However, this calculation does not follow the jury's instructions for calculating damages.

After reviewing the entire record, we conclude the jury's award of $1,680,000 for fraud and negligent misrepresentation was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. We sustain appellants' fourth and sixth issues.

■ We cannot reverse only on unliquidated damages when, as in this case, liability is contested. Tex.R.App. P. 44.1(b); *Redman Homes, Inc. v. Ivy*, 920 S.W.2d 664, 669 (Tex.1996). Accordingly, we must remand the liability portions of the fraud and negligent misrepresentation causes of action as well. Because attorney's fees and exemplary damages cannot be supported without a finding of liability, we sustain appellants' fourteenth and sixteenth issues. Tex. Bus. & Com.Code Ann. § 27.01(e) (Vernon 2002); Tex. Civ. Prac. & Rem.Code Ann. § 41.003 (Vernon Supp. 2004–05); Likewise, because the conspiracy claim cannot stand when the underlying tort (in this case fraud) fails, we sustain appellants' seventeenth issue.

## C. Double Recovery for Fraud and Breach of Fiduciary Duty

■ In the twelfth issue, Kelley contends the judgment's award of damages for both fraud and breach of fiduciary duty to Anderson gave Anderson a prohibited double recovery. The damages question for Kelley's breach of his fiduciary duty to Anderson instructed the jury to determine "[t]he difference, if any, between the value of Fred Anderson's 35% interest in Strategic Gas Services, Inc. as agreed to by the parties and its actual value. The difference in value, if any, shall be determined at the time and place the merger occurred." The jury answered $318,261. Under the evidence before the jury, "the value . . . as agreed to by the parties" and, under the fraud instruction, "the amount it would have been worth but for the fraud" were the same, about twice the value of GSI. Like the fraud damages, the values in the computation of the breach-of-fiduciary-duty damages were determined as of the time of the merger.

Thus, under trial court's instruction and the evidence, the formula for determining the damages for breach of fiduciary duty may be expressed as $D = (.35 \times 2 \text{ GSI}) - .35 \text{ (GSI} + \text{SCC} + \text{BMP)}$, with all values determined at the time of the merger. This is the same formula as for the fraud damages. *See supra* pp. 691–92. Accordingly, we conclude the damages for Kelley's breach of fiduciary duty to Anderson were duplicative of the fraud damages.

Anderson argues the awards are not duplicative because the jury could have computed Anderson's breach-of-fiduciary-duty damages by computing the value of the 20 percent of GSI Anderson gave Kel-

ley.[10] However, this figure is irrelevant to the instructed computation: the difference between the value of SGSI "as agreed to by the parties and its actual value." Under these facts, the jury instructions for calculating the damages for fraud and breach of fiduciary duty to Anderson involve the same calculation: the difference in value at the moment of the merger between Anderson's SGSI stock as promised/agreed to and its actual value.

Anderson also argues the breach-of-fiduciary-duty damages do not constitute a double recovery with the fraud damages because the breach of fiduciary duty and the fraud involved separate conduct. Anderson asserts that the breach of fiduciary duty arose from Kelley's request for an additional 20 percent of GSI. We disagree. The jury question on Kelley's breach of fiduciary duty to Anderson was for "the transaction in question," which, under the facts of this case, was the merger, not Kelley's pre-merger negotiations for additional shares of GSI. If the trial court intended for the jury question on breach of fiduciary duty to concern Kelley's additional 20 percent of GSI, then the damages question for breach of that duty would not have concerned the difference in value of Anderson's shares in SGSI "as agreed to by the parties and its actual value ... at the time ... the merger occurred."

We conclude the judgment contains a double recovery for Anderson. The trial court should have required Anderson to elect between the awards of damages against Kelley for fraud and for breach of fiduciary duty. Because we are reversing and remanding the fraud causes of action, we conclude we must also reverse and remand Anderson's breach of fiduciary

duty cause of action against Kelley because it concerns the same damages. *See Willis v. Donnelly*, 118 S.W.3d 10, 48 (Tex. App.-Houston [14th Dist.] 2003, pet. filed). We sustain Kelley's twelfth issue. Because of our resolution of the twelfth issue, we need not reach the eleventh issue asserting the fraud and breach-of-fiduciary-duty damages findings fatally conflict.

## III. BREACH OF FIDUCIARY DUTY TO SGSI

The jury found appellants breached their fiduciary duty to SGSI and that the breach of fiduciary duty from SGSI's purchase of its stock from Kelley and Crawford proximately caused damages to SGSI of $445,684.06. In the seventh issue, appellants contend no evidence or factually insufficient evidence shows they breached their fiduciary duty through Kelley and Crawford's sale of their stock to SGSI. In the eighth issue, they contend the jury's findings are not "supported by legally sufficient or alternatively factually sufficient evidence."

■■■■ The charge placed the burden of proof on appellants to prove they did not breach their fiduciary duties. An appellant attacking the legal sufficiency of an adverse jury finding on which he had the burden of proof must demonstrate that the evidence establishes, as a matter of law, all vital facts in support of the finding. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001) (per curiam). In reviewing such a claim, we first examine the record for evidence supporting the jury's finding, while ignoring all evidence to the contrary. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989). If there is no evidence to support the fact finder's answer,

**10.** In Plaintiff's Exhibit 10, "Mark's Stock Inequality," Kelley stated the value of his 10 percent share of GSI was $159,130. Twice that amount, or 20 percent of GSI, is $318,260, just one dollar off the jury's damages calculation for breach of fiduciary duty.

only then will we review the entire record to assess whether the contrary proposition was established as a matter of law. *See Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 940 (Tex.1991). If an appellant challenges a jury finding regarding an issue upon which the appellant had the burden of proof, he must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co.*, 46 S.W.3d at 241. In reviewing this challenge, we consider all of the evidence in determining whether the finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See In re King's Estate*, 150 Tex. 662, 665, 244 S.W.2d 660, 661 (1951). We may reverse and remand for a new trial if we conclude the jury's failure to find is against the great weight and preponderance of the evidence. *See Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex.1988).

## A. Liability

The jury was instructed that for each defendant to prove he complied with his fiduciary duty he must show:

a. the transaction in question was fair and equitable to Strategic Gas Services, Inc.;

b. the particular defendant made reasonable use of the confidence that Strategic Gas Services, Inc. placed in him;

c. the particular defendant acted in the utmost good faith and exercised the most scrupulous honesty toward Strategic Gas Services, Inc.;

d. the particular defendant placed the interests of Strategic Gas Services, Inc. before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Strategic Gas Services, Inc., and did not place himself in any position where his self interest might conflict with his obligations as a fiduciary; and

e. the particular defendant fully and fairly disclosed all important information to Strategic Gas Services, Inc. concerning the transaction.

The jury answered that all three appellants failed to prove they complied with their fiduciary duty to SGSI.

■ Appellants argue the "business judgment rule" bars judgment against them on this claim. To preserve error, a party must have brought the complaint to the attention of the trial court and obtained a ruling. TEX.R.APP. P. 33.1(a). Appellants did not plead the business judgment rule, the trial court did not instruct the jury on the business judgment rule, appellants did not request submission of an instruction on the business judgment rule, and appellants did not raise the business judgment rule in any of their post-verdict motions before the trial court. Because appellants did not raise this issue before the trial court, we conclude they have not preserved any error regarding the applicability of the business judgment rule.

■ Appellants next argue that they cannot be held liable for breach of fiduciary duty because their actions in the sale of their stock were in accordance with the Buy–Sell Agreement. Appellants cite several cases in support of this argument, but none of them involved fiduciaries. *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203 (Tex.1996); *Sakowitz, Inc. v. Steck*, 669 S.W.2d 105 (Tex.1984), *overruled on other grounds by Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex.1989); *Montgomery v. Phillips Petroleum Co.*, 49 S.W.2d 967 (Tex.Civ.App.-Amarillo 1932, writ ref'd); *First Fed. Sav. & Loan Ass'n v. Ritenour*,

704 S.W.2d 895 (Tex.App.-Corpus Christi 1986, writ ref'd n.r.e.). Accordingly, those cases are not applicable. Moreover, the fact the appellants had the contractual right to sell their stock to the corporation if the corporation agreed to buy it and the corporate authority to cause the corporation to buy the stock does not establish as a matter of law that they did not breach a fiduciary duty to SGSI in doing so. The issue is not whether the parties followed the Buy–Sell Agreement but whether the transaction was fair to SGSI and was performed with the utmost good faith and scrupulous honesty and without taking advantage of their position with SGSI at the expense of SGSI.

■■■ The jury could have concluded that appellants' use of the cash option, instead of the five-installment option, constituted a breach of their fiduciary duty. Appellants testified that one of the reasons for Crawford and Kelley's resignation was to stop the cash drain of their salaries. Despite this professed intention of preserving SGSI's cash resources, they proceeded to transact the purchase under the cash option instead of the installment option, which depleted 80 percent of the company's cash resources. Thus, the jury could have concluded that purchasing the shares for cash was not fair and equitable toward SGSI, was not in keeping with appellants' duty of utmost good faith and scrupulous honesty toward SGSI, and that appellants' took advantage of their positions with SGSI at the expense of SGSI. We conclude the evidence is legally and factually sufficient to support the jury's finding that appellants' breached their fiduciary duty to SGSI. We overrule appellants' seventh issue.

### B. Damages

In the eighth issue, we consider whether the evidence is legally and factually insufficient to support the jury's award of $445,684.06, the entire amount SGSI paid Crawford and Kelley for their shares. The company's collapse within a few months of the stock sale is some evidence that the removal of 80 percent of the company's cash resources caused it damage. Unlike the damages questions on the fraud and breach of fiduciary causes of action, the jury was not given a formula for determining damages. Instead the jury was simply instructed to determine "[t]he damages, if any, caused to Strategic Gas Services, Inc. by the purchase of the stock in Strategic Gas Services, Inc. owned by Mark Kelley and Jeff Crawford." Under this broad instruction, the jury could have concluded the damages SGSI suffered was the loss of the remaining value of the corporation after the purchase of Crawford's and Kelley's shares. Kelley and Crawford received the book value of $288.88 per share. At that time, there were 5142.8 shares outstanding, so the book value of the corporation was $1,485,652.06. That amount, minus the value of Crawford's and Kelley's shares, $445,684.06, yields damages of $1,039,968. These damages that the jury could have rendered are two-and-one-third times the damages the jury actually rendered. Accordingly, we conclude the evidence is legally and factually sufficient to support jury's finding of damages, and the damages awarded are not excessive. We overrule appellants' eighth issue.

In the fifteenth issue, appellants contend the trial court erred in awarding exemplary damages based on the breach of fiduciary duty to SGSI. This issue is dependent upon our reversing the SGSI's cause of action for breach of fiduciary duty. Because we have not reversed it, appellants' arguments lack merit. We overrule appellants' fifteenth issue.

## IV. BREACH OF FIDUCIARY DUTY TO SCC

In the ninth and tenth issues, Kelley and Crawford contend the evidence is legally and factually insufficient to support the jury's findings that they breached their fiduciary duty to SCC in the events surrounding the $300,000 loan to Spethmann. Spethmann does not challenge his liability on this cause of action.

The trial court instructed the jury that for each defendant to prove he complied with his fiduciary duty he must show:

a. the transaction in question was fair and equitable to Strategic Controls Corporation;

b. the particular defendant made reasonable use of the confidence that Strategic Controls Corporation placed in him;

c. the particular defendant acted in the utmost good faith and exercised the most scrupulous honesty toward Strategic Controls Corporation;

d. the particular defendant placed the interests of Strategic Controls Corporation before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Strategic Controls Corporation, and did not place himself in any position where his self interest might conflict with his obligations as a fiduciary; and

e. the particular defendant fully and fairly disclosed all important information to Strategic Controls Corporation concerning the transaction.

### A. Crawford's Liability

Having reviewed all the evidence, we conclude the record conclusively establishes that Crawford did not breach his fiduciary duty to SCC concerning the $300,000 loan to Spethmann. The evidence is undisputed that Crawford opposed the loan initially, did not participate in the creation of the loan, refused to give his consent to the loan when Spethmann asked him, and consistently insisted that Spethmann return the money or, at the least, put up security for the loan. Crawford received no financial or other gain from Spethmann's receipt of the loan. Nothing indicates Crawford acted other than with the utmost good faith and the most scrupulous honesty concerning the unauthorized loan. We conclude no evidence shows Crawford breached his fiduciary duty to SCC concerning the $300,000 unauthorized loan, and Crawford established as a matter of law that he did not breach his fiduciary duty to SCC in that transaction. We sustain the ninth issue.

### B. Kelley's Liability

The evidence shows Kelley, like Crawford, received no financial or other benefit from Spethmann's receipt of the $300,000 and that Kelley worked to get Spethmann to return the money or put up security for the loan. However, the record also shows Spethmann would never have received the money if Kelley had checked with Crawford, as he was required to do, to make sure all the directors authorized the loan before approving and funding the $300,000 loan to Spethmann. The evidence that Kelley approved and funded the loan based solely on Spethmann's statement that he "had run it by" Crawford shows Kelley did not make "reasonable use of the confidence that Strategic Controls Corporation placed in him." It also shows Kelley had not "fully and fairly disclosed all important information to Strategic Controls Corporation concerning the transaction," namely, that he had not obtained Crawford's authorization for the loan before approving and funding it.

**698**

Because some evidence shows Kelley breached his fiduciary duty to SCC, we conclude Kelley has not shown the evidence is legally insufficient. We also conclude the jury's finding is not against the great weight and preponderance of the evidence. We overrule the tenth issue.

## V. CONCLUSION

We reverse the trial court's judgment in part and render judgment that Anderson and SCC take nothing from Crawford.

We render judgment that Anderson take nothing from Kelley on his causes of action for common-law fraud through affirmative misrepresentation, negligent misrepresentation, and statutory fraud and that Anderson take nothing on his claims against Kelley for attorney's fees and exemplary damages concerning those causes of action.

We reverse and remand for further proceedings Anderson's causes of action against Spethmann for common-law and statutory fraud, negligent misrepresentation, and conspiracy as well as Anderson's claims for attorney's fees and exemplary damages concerning those causes of action.

We reverse and remand for further proceedings Anderson's causes of action against Kelley for common-law fraud through nondisclosure, conspiracy, and breach of fiduciary duty as well as Anderson's claim for exemplary damages concerning those causes of action.

We affirm the trial court's judgment in all other respects.